# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 24, 2002 Session

## ROSCOE H. WOODS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Anderson County**
**No. A0CR0250      James B. Scott, Jr., Judge**

---

**No. E2001-01790-CCA-R3-PC**
**February 18, 2003**

---

The petitioner appeals the denial of his petition for post conviction relief, arguing that the post-conviction court erred in finding that he received effective assistance of trial counsel. Based on our review, we conclude that the petitioner failed to meet his burden of demonstrating that his trial counsel provided ineffective assistance. Accordingly, we affirm the post-conviction court's denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

David A. Stuart, Clinton, Tennessee, for the appellant, Roscoe H. Woods.

Paul G. Summers, Attorney General and Reporter; Gill R. Geldreich, Assistant Attorney General; James N. Ramsey, District Attorney General; and Janice G. Hicks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In 1997, the petitioner, Roscoe H. Woods, was convicted by an Anderson County Criminal Court jury of three counts of rape based on three separate incidents of oral sex in 1993 and 1994 with his daughter, J.W.,[1] who was thirteen years old at the time. The petitioner was sentenced by the trial court to an effective sentence of ten years in the Department of Correction. His convictions were affirmed by this court on direct appeal, and his application for permission to appeal to the supreme court was denied. See State v. Roscoe H. Woods, No. 03C01-9801-CC-00029, 1999 WL 2831, at *1 (Tenn. Crim. App. Jan. 6, 1999), perm. to appeal denied (Tenn. July 19, 1999).

---

[1] It is the policy of this court to refer to minor victims of sexual assault by their initials only.

The direct appeal opinion provides the following account of the crimes:

>In 1989, after the defendant divorced his first wife, he was awarded custody of his two children, the victim J.W. and her twin brother Josh. In 1992, the defendant remarried, and by May 1993, he, J.W., and Josh had moved into their new home with the defendant's new wife, Paula Woods, and her two daughters from a prior marriage. J.W. testified that around midnight one evening in November 1993, the defendant asked her to watch television with him downstairs. According to J.W., he eventually undressed her, performed oral sex on her, and forced her to reciprocate. J.W. also testified that one evening in the spring of 1994, the defendant woke her in her bedroom at night and told her to come downstairs with him to watch television. According to J.W., he placed her on the floor, and the two engaged in mutual oral sex. J.W. further testified that later that spring, the defendant again woke her in her bedroom at night and touched her breasts, stomach, and in between her legs. According to J.W., he then undressed her and performed oral sex on her, but when he attempted to penetrate her, she pushed him off of her.

>J.W., who was thirteen years old at the time of these incidents, testified that none of this contact was consensual. Over objection, she also testified she first told a friend of these incidents approximately two years after they occurred. She then told her friend's mother, another friend, and her psychologist. In July 1996, she reported the incidents to the authorities.

Id. (footnote omitted).

On July 20, 2000,[2] the petitioner filed a *pro se* petition for post-conviction relief, asserting a number of different grounds for relief, including ineffective assistance of trial counsel. The post-conviction court appointed post-conviction counsel, and on February 26, 2001, an amended petition for post-conviction relief was filed. An evidentiary hearing was held on April 2 and April 6, 2001. Because the post-conviction court determined that ineffective assistance of counsel was the petitioner's only colorable claim, the proof was limited to evidence relating to the petitioner's allegations concerning the representation provided by his trial counsel. Six witnesses appeared at the hearing: trial counsel; a friend of the petitioner, Sheila Hudson, and her son, Chris; the petitioner's son; the petitioner; and the victim.

---

[2] On January 5, 2001, the post-conviction court entered an order stating that the parties agreed that the timeliness of the filing of the petition would not be raised as an issue in the case.

Trial counsel testified he had been practicing law in Tennessee for thirty-four years. When the indictments in the instant case were returned, he was representing the petitioner on a contingency basis in a civil lawsuit based on the petitioner's injury in an automobile accident. At the petitioner's request, he agreed to represent him in the criminal case as well, ultimately receiving $25,000 of the petitioner's judgment in the personal injury suit as payment for his representation in both cases.

Trial counsel described his preparation for the petitioner's criminal case. He did not hire an investigator, but instead conducted his own investigation which included obtaining copies of investigative reports from the police department, obtaining social service records on the petitioner's son, and interviewing or attempting to interview various witnesses involved in the case. He did not interview the three friends and acquaintances to whom the victim apparently first reported the alleged incidents, or a counselor to whom the victim talked. Trial counsel explained that the investigative reports indicated that none of these witnesses would be helpful to the petitioner's defense because "they were accepting things at face value without having done any investigation themselves." Moreover, because the victim had waited over two years to report the alleged incidents, trial counsel did not think the reports she had made to her friends constituted proper proof. Trial counsel said he objected to the introduction of the evidence at trial and the trial court upheld his objections for the most part, but some of the evidence had been admitted.

Trial counsel testified he had extensive conversations with the petitioner prior to trial, meeting with him two to four times in the petitioner's home and "numerous times" at counsel's office. He questioned the petitioner about any witnesses who might be able to testify on his behalf, and did not recall the petitioner's having named any witnesses other than those used at trial. Trial counsel acknowledged he had a note in his file about a telephone conversation he had with a woman named Sheila Hudson on November 6, 1997, after the petitioner's October trial. He could not recall who initiated the contact; he had no memory, however, of the petitioner's having ever mentioned her name before trial. Trial counsel said Ms. Hudson told him of a conversation she had had with the victim in the spring of 1997 during a chance encounter at a shopping mall. His notes of that conversation, which were admitted as an exhibit at the evidentiary hearing, reflected Ms. Hudson's having told him that the victim said, "Did you hear what I did to dad? I had to do something. I had to get back at him one way or another."

According to trial counsel, his trial strategy was to try to show that the victim was fabricating the allegations of sexual abuse in an effort to punish the petitioner for perceived slights in his treatment of her compared with his treatment of her stepsisters. During his cross-examination, counsel elicited from the victim that she had felt neglected by her father in favor of her stepsisters and that her relationship with him was hostile. Trial counsel discussed with the petitioner his tactic of attacking the victim's credibility by introducing evidence of an uncharged crime, which consisted of the victim's allegation that the petitioner had raped her in his pickup truck as she and the petitioner were returning from taking the victim's twin brother, Josh, to a residential treatment center in Roane County. Since Josh testified that the victim had never accompanied him on such a trip, trial counsel believed the testimony would create doubt in the jurors' minds about all of the victim's allegations against the petitioner.

Trial counsel testified he spoke with Josh three or four times prior to trial to find out what he remembered of the circumstances surrounding the alleged incident and learn what kind of relationship he had with his father. Based on those conversations, counsel was under the impression that Josh and the petitioner had a good relationship. Josh appeared intelligent, and trial counsel had believed he would make a good witness, able not only to refute the victim's account of the Roane County incident, but also "[t]o show that the [petitioner] was caring and that they all lived in the home together and participated in activities together and, . . . he had what he felt was a close relationship with his sister." Trial counsel conceded that the State's cross-examination of Josh, showing what trial counsel termed as "inconsistencies" in his testimony, was damaging to his credibility.

The direct appeal opinion describes how the State attacked Josh's credibility:

> On direct examination, Josh testified that the defendant disciplined J.W. because she would not "follow through" with her school work. Josh also testified that J.W. would confide in him, but she never complained to him that the defendant had sexually abused her. On cross-examination, the State asked Josh whether in October 1995, he had told Mark Jones, a social worker with the Tennessee Department of Human Services (now called "Department of Children's Services"), that the defendant had hit him in the head four times, retrieved a knife from the kitchen, and hit him again when Josh asked him for a cigarette. Over defense objection, Josh testified he told Mr. Jones he was hit only once. The State asked Josh whether he had told Mr. Jones on other occasions that the defendant had said he wanted to "get rid of" Josh, had fired a gun in the family's home and threatened to kill Josh, had threatened to send Josh to a juvenile delinquent facility, and had threatened to "beat [his] head in." Josh denied telling Mr. Jones these things. Instead, Josh testified he had a very good relationship with the defendant and was not afraid the defendant would terminate their relationship if he testified against him.

> To further impeach Josh Woods' testimony, the State called Mr. Jones. Defense counsel attempted to invoke, on Josh's behalf, a statutory privilege to confidential communications between clients and certified master social workers. See T.C.A. § 63-23-107 (1997). Because Mr. Jones told the trial court he was not a certified master social worker, the trial court allowed Mr. Jones to testify. On the witness stand, Mr. Jones confirmed that Josh had reported incidents of physical abuse by the defendant. Mr. Jones also testified that on different occasions, Josh had reported that the defendant said he wanted "to get rid of" Josh, had fired a gun from the house and

-4-

threatened to kill him, and had threatened to send Josh to a juvenile delinquent facility and "beat his head in." The trial court accompanied this testimony with two limiting instructions to the jury, telling them that this evidence was not substantive evidence these events occurred, but rather was for the sole purpose of impeaching Josh's testimony and testing his credibility.

Woods, 1999 WL 2831, at *4. Trial counsel testified he had been aware of the alleged child abuse, but had not thought it relevant since it occurred so long after the date of the indicted offenses. He had vigorously objected to the introduction of the evidence at trial, arguing that it was not relevant and that its prejudicial effect far outweighed any probative value but had been unsuccessful, both at trial and on appeal.

Trial counsel disagreed that he had asked the petitioner questions on direct examination that implied the victim's allegations were true, asserting that such an inference could not be made if the questions were read in context. He said he and the petitioner discussed his introduction of the uncharged rape "at substantial length." Trial counsel did not think any of his witnesses created "disasters" in his proof, in that none said anything at trial that was completely different from what he expected. However, he did think it "disastrous" that the trial court had not allowed him to present the testimony of Dr. Ira Lew, a psychiatrist who had treated the victim. He said Dr. Lew was originally listed as one of the State's witnesses, but the State had opted not to call him at trial. Having anticipated that would occur, trial counsel also subpoenaed Dr. Lew, believing that his testimony would be instrumental to show that the victim thought of herself as sophisticated and worldly, rather than as shy and retiring, as she had attempted to portray herself at trial. In spite of trial counsel's strong arguments on the issue, the trial court refused to allow Dr. Lew's testimony, and this court upheld that decision.

Sheila Hudson testified she had been friends with the petitioner for over fifteen years and had dated him while he was in the process of divorcing the victim's mother, before he met his present wife. They remained friends after the petitioner's marriage to his current wife, and she first learned of the indictments from the petitioner. Sometime after the petitioner had been charged but before the trial, Hudson and her son encountered the victim at a mall where the victim also told her about the charges. When she asked the victim what was going on, the victim told her, "I'm getting my revenge. I'm finally going to get my revenge." She asked, "Revenge for what?" and the victim replied, "Revenge for the way me and Josh have been treated for all these years." According to Ms. Hudson, the victim told her she was "sick" of the fact that she and Josh had to do chores and were getting grounded, while their step-siblings never had to do anything.

Ms. Hudson testified she told the petitioner about the conversation. Although the petitioner told her he had in turn informed trial counsel, she was not subpoenaed as a witness and trial counsel did not contact her until after the trial, when he telephoned to ask her to relay her conversation with the victim. Ms. Hudson acknowledged she had known trial counsel was representing the petitioner, but she did not herself try to contact him before the trial. She said she did not attend the trial, despite

being friends with both the petitioner and his wife, because the petitioner had asked that she not do so. Ms. Hudson testified the petitioner was humiliated by the charges, implying that was the reason he did not want her to attend the trial.

Ms. Hudson's fifteen-year-old son, Chris Hudson, testified he was about ten years old when he and his mother encountered the victim at a mall around Christmas in 1996. All he could remember about the incident was that the victim mentioned the petitioner, and she and his mother then engaged in conversation.

The petitioner's son, Josh Woods,[3] did not respond to his subpoena to appear on the original date of the evidentiary hearing. The post-conviction court therefore issued an attachment, causing him to be brought to the April 6, 2001, continuation of the hearing in custody. Josh's testimony at the evidentiary hearing concerned trial counsel's alleged failure to adequately prepare his trial testimony. He testified he and trial counsel spoke for about a minute during a meeting he attended with his father in counsel's office, and for "[a]pproximately five-to-seven minutes" during a meeting at the petitioner's house. In addition, he said he may have had another brief conversation with trial counsel prior to trial. Trial counsel did not review with him the reports prepared by the Department of Children's Services ("DCS") employee who had investigated the charges of child abuse against the petitioner, and Josh said he had not realized he would be cross-examined about the information he had provided to the DCS investigator. He testified that he had become confused when answering the assistant district attorney general's questions and thought his testimony would "[m]ost definitely" have been more credible had he been better prepared before trial. He acknowledged, however, that in addition to the time trial counsel spent talking directly with him, he had been present in meetings trial counsel held with his father, and therefore "knew what the trial was about and what was going on[.]" He also acknowledged he had testified truthfully and said he did not know if his testimony would have been any different had trial counsel spent more time preparing him for trial.

In response to questions by the post-conviction court, Josh explained that he had failed to respond to the subpoena because he feared that if he appeared in court he would be arrested and taken to jail on an outstanding violation of probation warrant. He said he was not hesitant to testify for his father. He loved his sister and maintained a relationship with her, but believed his father was innocent.

The petitioner testified, contrary to trial counsel's testimony, that he and counsel agreed that evidence of the uncharged rape would not be brought up at trial. He said trial counsel told him that if the State attempted to bring the evidence in, he would do everything he could to keep it out. The petitioner was therefore surprised when trial counsel introduced the evidence himself. When he complained and asked why trial counsel had done it, counsel told him, "It slipped. I'm sorry." He said he talked with trial counsel at least three times before trial about the testimony Sheila Hudson could provide in his defense, but trial counsel was not interested, telling the petitioner that they did

---

[3]Because Josh Woods and the petitioner share the same last name, we will refer to the witness as "Josh" to avoid having to use his entire name so that his testimony will not be confused with that of the petitioner.

not want to "clutter the jury's minds up with too many people." He was unhappy with trial counsel's performance at trial, but allowed him to continue his representation because he had already paid for his services through the direct appeal of the case.

Trial counsel, recalled as a rebuttal witness by the State, reiterated that he had discussed with both the petitioner and Josh before trial that part of his trial strategy would be to introduce the Roane County incident in order to have Josh refute it. He had no memory of the petitioner's having complained to him about that strategy either at or after the trial, and was positive he never told the petitioner he had let the evidence "slip." Although unhappy about the verdict, the petitioner had appeared satisfied with his representation at trial, and trial counsel had continued to represent him after trial, filing a direct appeal to this court, a petition to rehear, and an application for permission to appeal to the supreme court. Trial counsel testified he had handled two criminal cases with similar facts not long before the petitioner's case, one of which resulted in an acquittal, and the other of which was dismissed in the middle of a jury trial.

The final witness was the victim, who testified that Ms. Hudson's account of their conversation at the mall was not accurate. According to the victim, the conversation occurred after, rather than before, the trial and consisted of her asking if Ms. Hudson had heard what had happened to the petitioner, and Ms. Hudson telling her that she did not believe her allegations. The victim testified she remembered having said something to Ms. Hudson about having to get justice and said she had walked away from Ms. Hudson after Ms. Hudson told her she did not believe the allegations. The victim was confident the conversation had occurred around Christmas time, after the trial, because she remembered there were Christmas decorations at the mall.

On July 17, 2001, the post-conviction court entered an order denying the petition for post-conviction relief. The court found, *inter alia*, that there was no evidence trial counsel was deficient in his investigation and preparation for trial, including his preparation of the witnesses' testimony; trial counsel's decisions regarding which witnesses to call at trial were part of a sound trial strategy which the post-conviction court would not second-guess; trial counsel had not known of Sheila Hudson before the trial; trial counsel fully developed the issue of credibility of the witnesses at trial; and all other allegations of deficiency in counsel's performance amounted to "[issues] of choice in presenting a defense that the events did not occur." Accordingly, the post-conviction court concluded that the petitioner had not met his burden of demonstrating that he was denied the effective assistance of counsel by showing that trial counsel was deficient and he was prejudiced as a result, and denied the petition. Thereafter, the petitioner filed a timely appeal to this court, challenging the post-conviction court's denial of the petition.

## ANALYSIS

On appeal, the petitioner asserts trial counsel provided ineffective assistance by deliberately introducing evidence of the uncharged rape; failing to elicit denials of the allegations from the petitioner during his trial testimony; asking questions of the petitioner and the victim that contained the premise the alleged offenses had occurred; failing to identify, locate, and call Sheila Hudson as

a witness at trial; opening the door to the State's introduction of evidence that the victim had reported the rapes to third parties two years after their occurrence; and failing to make his request for a special jury instruction in writing, as required by the Tennessee Rules of Criminal Procedure.

## I. Post-Conviction Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461.

## II. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient, and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine

confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

### III. Petitioner's Specific Allegations of Ineffective Assistance

### A. Trial Counsel's Introduction of Uncharged Crime

The petitioner first contends trial counsel provided ineffective assistance by deliberately introducing evidence of the alleged incident in Roane County. The petitioner argues that, given the well-recognized danger that other crime evidence will unfairly prejudice the jury against a defendant, no reasonable defense attorney would have adopted trial counsel's strategy of introducing evidence of the uncharged rape. He asserts trial counsel's error was compounded by his failure to prepare Josh for the DCS evidence used to impeach his testimony, and by his failure to follow through with his "professed trial strategy" by eliciting a denial of the Roane County incident. The State responds that counsel's introduction of the uncharged rape was a strategic decision made in the context of a reasonable trial strategy, which cannot constitute ineffective assistance of counsel.

We agree with the State that the petitioner did not show by clear and convincing evidence that trial counsel deliberately introduced the uncharged rape without his consent and against his wishes. The petitioner testified trial counsel assured him the evidence was not admissible and he would do everything in his power to keep it out if the State attempted to bring it in. In later testimony, however, the petitioner indicated he remembered trial counsel instructing Josh on how to testify in the event the evidence was introduced. The petitioner said trial counsel told Josh he did not think the evidence would be brought up, but if it was, all he had to do was tell the jury who "took [him] back and so forth." Trial counsel's testimony, by contrast, was unequivocal that he had discussed his trial strategy, including his introduction of the uncharged rape, at substantial length with the petitioner prior to trial. He said he told the petitioner the evidence could be negative, but he thought it would help his case, given the fact that Josh would be able to refute the allegation by testifying that the victim had not been present during the drive to the treatment center. Trial counsel was also confident he never told the petitioner that he had let the evidence "slip."

We further agree with the State that the petitioner has not shown that trial counsel's decision to introduce evidence of the uncharged rape constitutes ineffective assistance of counsel. The Strickland court cautioned that judicial review of an attorney's performance should be "highly deferential," with every attempt made to "eliminate the distorting effects of hindsight, to reconstruct

the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689, 104 S. Ct. at 2065. Thus, when analyzing a petitioner's allegations of ineffective assistance of counsel, this court must indulge in a strong presumption that the conduct of counsel fell within the range of reasonable professional assistance, see id., 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless they were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

The record supports the post-conviction court's finding that trial counsel adequately prepared and investigated the case. Trial counsel was obviously aware of the risk of introducing evidence of an uncharged crime. However, under the circumstances that existed in this case, where the petitioner's son would be able to refute that the victim had been present on the trip to Roane County, counsel believed the evidence would help the petitioner's defense by diminishing the victim's credibility. We cannot conclude that this tactic was unreasonable.

The petitioner asserts trial counsel's attempt to use Josh to refute the Roane County incident was "doomed to failure, and was not a strategy which would have been employed by any reasonable attorney." We respectfully disagree. Although Josh testified at the hearing that he thought he could have been better prepared at trial, he was unable to say that his testimony would have been any different had trial counsel spent more time preparing him for cross-examination. Trial counsel testified he had several conversations to prepare Josh for trial. He said he was familiar with Josh's social service records and was aware that the DCS worker who investigated the charges of child abuse was on the State's witness list. However, trial counsel believed Josh would make a good witness for the defense and thought he would be able to prevent the DCS evidence from being admitted. Under these circumstances, we cannot conclude that trial counsel's decision to have Josh refute the details of the uncharged crime in an attempt to discredit the victim's allegations was a tactic that no reasonable defense attorney would have employed.

The petitioner also argues trial counsel was deficient for failing to follow through with his trial strategy by eliciting from the petitioner on direct examination a denial of the Roane County incident. The trial transcript[4] reveals, however, that the petitioner testified no one ever accompanied him on any of the trips to pick up or return Josh to the treatment center. Since the victim testified that the incident occurred in the petitioner's pickup truck as they were returning from leaving Josh at the treatment center, the clear effect of the petitioner's testimony was to deny that the incident had occurred. The petitioner's direct examination contains the following exchange:

> Q      All right. On those occasions when [Josh] came home, who would go get him?

___

[4] Only a few portions of the trial transcript, most notably, voir dire of the jury and closing arguments, were included in the record before this court. We have, however, taken judicial notice of the entire transcript of the petitioner's trial, having determined that it was necessary for us to review portions of the trial testimony in order to conduct a thorough review of the issues the petitioner raises in this appeal.

> A       Me.
>
> Q       Who would be with you?
>
> A       No one.
>
> . . . .
>
> Q       All right.  And who would take Josh back to Camelot?
>
> A       I would.
>
> Q       And who would go with you all?
>
> A       No one.
>
> Q       No one ever went with you back to Camelot?
>
> A       No.

As to the claims that trial counsel was ineffective by introducing testimony of the uncharged crime, the record supports the finding of the post-conviction court that the petitioner failed to establish this was other than permissible trial strategy or that he was prejudiced thereby.

### B.  Failure to Elicit Denials of Rape Allegations from Petitioner

In a related claim, the petitioner contends trial counsel provided ineffective assistance by failing to elicit during his trial testimony denials of the charged and uncharged allegations of rape. He concedes trial counsel asked him about two of the alleged incidents on direct examination, but asserts he failed to elicit denials of all four of the allegations.  The petitioner argues trial counsel's failure to elicit denials of all four incidents, including his failure to elicit a denial of the uncharged rape despite his testimony it was part of his trial strategy to do so, made his performance fall outside the range of competence demanded of attorneys in criminal cases and prejudiced the outcome of his case.

We conclude that the petitioner has failed to show that counsel's performance in this regard was deficient, or that he was prejudiced as a result of counsel's alleged deficiency in performance. As we have previously discussed, the petitioner's denial of the Roane County incident was implicit in his testimony that no one ever accompanied him on the trips to the treatment center.  As for the three charged offenses, the evidence was that two occurred downstairs in the television room and one occurred upstairs in the victim's bedroom.  The petitioner concedes counsel elicited denials of the upstairs incident and one of the downstairs incidents, but maintains that he failed to elicit a denial of the second incident downstairs.  However, although trial counsel began his questioning by asking

if there was ever a time "around midnight" when the victim came downstairs, the trial transcript, read in context, reveals that he elicited emphatic denials from the petitioner that neither the alleged upstairs incident nor either of the alleged downstairs incidents had occurred:

> Q    In regard to the testimony of [the victim] about these incidents that occurred there in your home, was there ever any incident where she came down around midnight to that lower room and you had these contacts with her that she described?
>
> A    No, sir.
>
> Q    She described another incident up in her bedroom.
>
> A    No, sir.
>
> Q    Those things did not happen?
>
> A    They did not happen.
>
> Q    Do you love your son and your daughter?
>
> A    Yes. I think my daughter's very mixed up at the moment. But I still love her, yes.

The record does not support the petitioner's claim that trial counsel did not elicit denials that the charged and uncharged offenses had occurred. We conclude that the post-conviction court was correct in determining that the petitioner was not prejudiced by trial counsel's handling of these matters.

### C.  Form of Trial Counsel's Questions to Petitioner and Victim

The petitioner next contends trial counsel provided ineffective assistance by asking two questions during the petitioner's direct examination testimony and one question during cross-examination of the victim that implied the victim's allegations were true. During trial counsel's direct examination of the petitioner, he asked whether December 1995, which the petitioner had just testified was the date he received neck injuries in an automobile accident, was "after the incidents complained of this morning by your daughter?" He also asked the petitioner, "Now you heard your daughter describe some incidents that occurred down in the downstairs – what was it, a TV room?" The petitioner asserts both of these compound questions contained the premise the incidents "had in fact occurred," and his responses could have easily left the jury with the impression he was admitting not only that he sustained the neck injuries on a certain date and that there was a TV room downstairs, but also that the incidents "had indeed occurred." Similarly, the petitioner complains trial counsel's question to the victim, "You didn't tell them about these activities with your

-12-

father?"contained the premise that the allegations were true.  He asserts that no competent attorney would have phrased such questions to either the petitioner or the victim, and counsel's error was compounded by his failure to "cure" the "prejudicial confusion" created by eliciting denials from the petitioner of each specific allegation.

The State argues that trial counsel did not concede that the rapes had occurred, and we agree.  When the questions and answers are read in context, it is clear that neither trial counsel nor the petitioner ever acknowledged or implied that the victim's allegations were true.  Trial counsel referred to the incidents as "alleged" numerous times throughout the trial; no reasonable jury could have interpreted his failure to insert the word "alleged" on each and every instance he referred to the incidents as his or the petitioner's admission that the allegations were true.  A review of the testimony that occurred just prior to trial counsel's question to the victim illustrates this point.  After eliciting that the victim had herself been in treatment for "[u]nruliness and depression and chemical dependency," the following questions and answers were exchanged:

> Q    Now did you tell any of those people at Camelot during that period of time, about these allegations against your father of a sexual nature?
>
> A    No.
>
> Q    You did not?
>
> A    No.
>
> Q    And you were outside the home, were you not?
>
> A    As in how?
>
> Q    When you were at Camelot; you were there at Camelot.
>
> A    I did not stay.  I did not stay.  I had day treatment.  I lived at home.  I went in the mornings, and came home in the afternoons.
>
> Q    But when you were being interviewed, you were at Camelot with a counselor or a psychiatrist, were you not?
>
> A    When I was being interviewed how?
>
> Q    By a counselor or a psychiatrist.
>
> A    No, I did not say a word to them.

-13-

Q       You didn't tell them about these activities with your father?

A       No.

The record supports the determination of the post-conviction court that the petitioner failed to establish that he was prejudiced by trial counsel's questioning of the victim as to these matters.

### D.  Failure to Call Sheila Hudson to Testify at Trial

The petitioner next contends trial counsel was ineffective for failing to "identify, locate, interview and call Sheila Hudson" as a witness on his behalf at trial. He asserts he demonstrated trial counsel knew of Hudson's existence at trial by "his positive testimony" at the evidentiary hearing that he provided trial counsel with her name and telephone number before trial, the "lack of memory on the part of [trial counsel]" about whether he had been informed of her name before trial, and "the testimony of the witness that she was contacted by counsel shortly after the trial." (petitioner's emphasis).  The State contends the petitioner did not show by clear and convincing evidence that trial counsel knew of Hudson prior to November 6, 1997, the date his notes reflected she told him of her mall conversation with the victim.  We agree with the State.

The record supports the post-conviction court's finding that trial counsel did not know of Sheila Hudson prior to trial.  Although the petitioner testified that he provided trial counsel with Ms. Hudson's name and number before trial, and Ms. Hudson testified the petitioner told her he had informed trial counsel of her existence, trial counsel had no memory of having ever heard her name until after the trial.  We also note that Ms. Hudson testified the petitioner asked her to stay away from the trial, which does not support the petitioner's claim that he asked trial counsel to call her as a witness on his behalf.  In addition, the victim and Ms. Hudson's son both testified that the conversation between the victim and Ms. Hudson occurred around Christmas time.  The victim testified that she had a specific memory of Christmas decorations already being up at the mall, a circumstance making it unlikely that the conversation occurred before the October trial.  Ms. Hudson's son did not hear the conversation, and the victim denied the substance of the conversation Ms. Hudson reported.  Questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are resolved by the post-conviction court and not this court.  Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).  The post-conviction court obviously chose to accredit the testimony of trial counsel and the victim over the testimony of the petitioner and Ms. Hudson.  The evidence does not preponderate against this credibility determination by the post-conviction court.

The petitioner is not entitled to post-conviction relief on this claim.

### E.  Trial Counsel's Invitation of Error

The petitioner next claims trial counsel provided ineffective assistance because he "invited error" by eliciting testimony from the victim's mother that the victim had told her about the rapes.

In his direct appeal to this court, the petitioner contended that the trial court erred in allowing the victim to testify she had told a friend about the rapes two years after their occurrence, arguing that "two years is 'well beyond any parameters established by any Tennessee case regarding fresh complaint.'" Woods, 1999 WL 2831, at *2. This court concluded on direct appeal that any error in admitting the testimony was harmless because it was trial counsel who first elicited testimony from the victim's mother that the victim had told a third party, *i.e.*, the mother, about the rapes:

> Even assuming it was erroneous to admit J.W.'s "fresh complaint" testimony, the defendant is not entitled to a reversal. A review of the record reveals that defense counsel first introduced evidence that J.W. had told a third party about the rapes. . . . . The defendant complains of evidence that J.W. told a third party, her friend, about the rape incidents, but he invited that error by first eliciting similar testimony from another third party, J.W.'s mother. Moreover, testimony that J.W. confided in a friend was merely cumulative to the evidence defense counsel had already elicited from J.W.'s mother. Because of this, J.W.'s testimony that she told her friend about the rapes did not affect the result of the trial. Thus, any error in admitting this testimony was harmless and does not warrant reversal.

Id. at *3.

The petitioner argues trial counsel was deficient for opening the door to the "damaging evidence" of the victim's having reported the alleged rapes to third parties, and that his deficiency can "only properly be viewed as a breakdown of the adversarial process in this case." However, we agree with the State that the petitioner failed to show how trial counsel's questioning of the victim's mother prejudiced the outcome of his trial. The State submits that, rather than prejudicing the petitioner, evidence that the victim waited over two years before informing anyone of the rapes "probably undermined the State's case, since this was ultimately an issue of credibility between [the victim] and her father." The record supports the determination of the post-conviction court that the petitioner failed to establish that he was prejudiced by trial counsel's handling of this matter.

### F. Failure to Submit Written Request for Special Jury Instruction

Finally, the petitioner contends trial counsel was ineffective for failing to request in writing that the trial court instruct the jury that it could consider, in its determination of the victim's credibility, the fact that she had not immediately reported the rapes after they had occurred. Trial counsel raised the trial court's failure to give the requested instruction as an issue on direct appeal, where this court concluded the issue was waived because trial counsel did not file a written request for the instruction before the jury retired to deliberate, in accordance with Tennessee Rule of Criminal Procedure 30(a). Id. at *6. Because the petitioner did not show a reasonable probability

that the outcome of his trial would have been different had the jury instruction been given, we conclude he is not entitled to post-conviction relief on this claim.

The petitioner cites United States v. Cronic, 466 U.S. 648, 659, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), and Brimmer v. State, 29 S.W.3d 497, 508 (Tenn. Crim. App. 1998), to argue that trial counsel's combined alleged deficiencies in performance resulted in an "actual breakdown of the adversarial process," Cronic, 466 U.S. at 657, 104 S. Ct. at 2046, thereby eliminating the need to show prejudice. The post-conviction court found, however, that trial counsel fully developed the issue of the credibility of the witnesses at trial, adequately investigated and prepared the case, did not know of Sheila Hudson's existence prior to trial, and that all other allegations of deficient performance were choices made by trial counsel as part of his trial strategy. The record supports these findings.

## CONCLUSION

Having reviewed the entire record in this case, including pertinent portions of the direct appeal record, we conclude that the petitioner has failed to meet his burden of demonstrating that he was denied the effective assistance of counsel. Accordingly, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE